# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### ATHENS DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **v.** | **CRIMINAL ACTION NO.** |
| | **3:22-cr-00025-TES-CHW-3** |
| **LANEL CHAMBERS,** | |
| *Defendant.* | |

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

Before the Court is Defendant Lanel Chambers's Motion to Suppress [Doc. 238].

Defendant seeks to suppress all evidence gathered by law enforcement officers in this

case, arguing that the four search warrants were invalid and that his post-arrest

statement was not freely and voluntarily given. *See* [Doc. 238]. The Government has

demonstrated, by a preponderance of the evidence, that each search warrant was

supported by probable cause and that Defendant waived his *Miranda* rights before

speaking to police. Thus, as explained in further detail below, the Court **DENIES**

Defendant's Motion to Suppress [Doc. 238].

## BACKGROUND[1]

In January 2022, Investigators Robert Walton and Thomas Dangle of the

---

[1] Unless otherwise noted, the Court draws these facts from within the "four corners" of the search warrant affidavits. See *United States v. James*, 601 F. App'x 789, 791-92 (11th Cir. 2015) (quoting *Illinois v. Gates*, 462 U.S. 213, 239 (1983)).

Gwinnett County Police Department ("GCPD") Narcotics Unit interviewed a confidential source ("CS-1") regarding narcotics sales and trafficking. [Doc. 240-1, p. 3]. CS-1 informed them that an individual known as "LC" (later identified as Defendant) was running a drug-trafficking operation from a new "trap house"[2] at the Reflections on Sweetwater Apartments in Lawrenceville, Georgia. [*Id.*]. CS-1 explained that after Defendant's previous trap house in Peachtree Corners, Georgia, was compromised by a police raid that resulted in the arrest of Bertram "Black" Leonard and the confiscation of Defendant's firearms, Defendant obtained a new apartment in the Reflections on Sweetwater complex. [*Id.*]. CS-1 further noted that Defendant's cousin had rented that apartment on his behalf, and that prior to the warrant's execution, CS-1 had visited that location to purchase narcotics. [*Id.*].

A few months earlier, in November 2021, Investigator Walton participated in the investigation and search of the Peachtree Corners apartment referenced by CS-1. [*Id.* at p. 4]. During that investigation, at least two confidential sources indicated that Defendant not only sold narcotics alongside Leonard but was also the source of Leonard's narcotics supply. [*Id.*]. Electronic surveillance and undercover operations further revealed that Defendant frequently came and went from the Peachtree Corners apartment. [*Id.*]. Eventually, Investigator Walton obtained a search warrant, which

---

[2] "Trap house" is a common street term used to refer to a place where narcotics are frequently sold.

GCPD executed on November 19, 2021, arrested Leonard on site, and seized various quantities of crack cocaine, marijuana, MDMA, methamphetamine, four firearms, and over $21,000 in U.S. currency. [*Id.*]. However, during this operation, LC was not present. [*Id.*].

Shortly after his arrest, Leonard placed a phone call from the Gwinnett County Jail to a phone number registered to Lacheisa Chambers—Defendant's wife—at 5055 Shadow Path Lane, Lilburn, Georgia (the "Shadow Path House").[3] [*Id.*]. In that phone call, Leonard instructed the person on the other end of the line to "go back and get that place cleaned up." [*Id.*]. Specifically, Leonard said to look under the washing machine (where GCPD, in fact, had located a substantial sum of cash) for "U.S. Currency." [*Id.*].

CS-1 provided specifics about Defendant's post–Peachtree Corners activities, stating that Defendant had obtained a new stash house in either Building 3 or Building 4 of the Reflections on Sweetwater Apartment, and that his primary residence was on Shadow Path Lane in Lilburn, Georgia. [*Id.* at p. 3]. CS-1 reported that he had been to both locations replenish his supply of narcotics. [*Id.* at p. 4]. Investigators drove CS-1 to both addresses, and he identified the Shadow Path House as LC's primary residence, and Apartment #346 in Building 3 (the "Sweetwater Apartment") as LC's stash house. [*Id.* at pp. 3–4].

---

[3] Leonard placed the call to (706) 690-6249. [Doc. 240-1, p. 4].

On February 2, 2022, Investigator Dangle consulted with Special Agent J. Jacobs of the Drug Enforcement Agency ("DEA") and learned that the DEA was investigating Defendant as a suspected supplier of heroin, fentanyl, cocaine, methamphetamine, and marijuana for a dealer in Athens, Georgia—Michael Arnold. [*Id.* at p. 4]. That same day, after leaving the Sweetwater complex, Arnold was pulled over by Georgia State Patrol. [*Id.*]. From his vehicle, law enforcement officers recovered approximately 247.7 grams of narcotics that tested positive for fentanyl and heroin. [*Id.*]. In a post-arrest interview, Arnold waived his *Miranda* rights, identified his supplier as "LC" and gave police a physical description matching Defendant. [*Id.* at p. 5]. Arnold also gave step-by-step directions to the Sweetwater Apartment, describing it as LC's "trap house." [*Id.*]. He added that the day prior he had observed a kilogram of meth, a kilogram of cocaine, and marijuana there. [*Id.*].

Following Arnold's arrest, GCPD and other officers turned their attention to Chambers's residence—the Shadow Path House. [*Id.*]. On February 2 and 3, 2022, investigators spotted a red Jeep Latitude, which they suspected to be a rental car, traveling from the Shadow Path House to various other locations, including Atlanta, and eventually returning to the Sweetwater Apartment. [*Id.* at pp. 5–6]. Surveillance footage showed Defendant, matching Arnold's physical description, arriving in that Jeep and going upstairs to the Sweetwater Apartment with a backpack. [*Id.* at p. 6].

On February 4, 2022, GCPD Investigator Robert Walton applied for and secured

a search warrant (No. 22X00118) to search the Sweetwater Apartment, *see* [Doc. 240-1]; [Doc. 240-2], and on February 8, 2022, Investigator Dangle obtained a search warrant (No. 22X00142) for the Shadow Path House, *see* [Doc. 240-3]; [Doc. 240-4]. In addition to much of the same information contained in the Sweetwater Apartment affidavit, the Shadow Path House affidavit noted that two different sources described Defendant accepting large sums of drug proceeds at the Shadow Path House, and a Georgia Secretary of State Business search revealed that the Shadow Path House was the principal office address for an LLC organized by Defendant and his wife, Lacheisa Chambers, in 2019. [Doc. 240-3, p. 8].

On February 10, investigators observed Defendant exit the Sweetwater Apartment, get into a gray Dodge Charger, and drive to a RaceTrac gas station in Lawrenceville. [Doc. 240-5]. While Defendant was driving, law enforcement executed both search warrants simultaneously. [*Id.*]. At the Sweetwater Apartment, they discovered fentanyl pills, methamphetamine, cocaine, marijuana, digital scales with cocaine residue on them, baggies used to package narcotics, and a metal press commonly used to press narcotics. [*Id.* at p. 3]. At the Shadow Path House, they found heroin, cocaine, marijuana, a metal press, digital scales, and over $11,000.00 in cash. [*Id.*]. Based on that information, GCPD Uniform Officers arrested Defendant as he was exiting the RaceTrac and walking to a Waffle House down the street. [*Id.*]. A K-9 unit positively alerted on Chambers' vehicle, which was then was towed to the GCPD

Headquarters. [*Id.*].

Following his arrest, Defendant was transported to GCPD headquarters. [*Id.*] In a post-arrest interview, Defendant acknowledged that he had been driving the Charger (although not the registered owner), admitted that there was marijuana in the car, and stated that his wife was not involved in any drug activities. [Doc. 240-5]. He also confirmed living at the Shadow Path House for the past two or three years. [*Id.*].

On February 10, 2022, GCPD Investigator Walton obtained and executed a third search warrant (No. 22X00152) for Defendant's Dodge Charger. [Doc. 240-6]. The search yielded 399 grams of heroin, 287 grams of methamphetamine, 160 grams of cocaine, 4 grams of marijuana, a digital scale, latex gloves, and small plastic bags. [Doc. 240-7, pp. 8–9]. Two cell phones were also found, prompting a fourth warrant (No. 22X00174) on February 14, 2022, to examine the phone data. *See* [Doc. 240-8]. Investigator Walton noted in his affidavit that drug traffickers routinely use multiple cell phones, change numbers frequently, and rely on application-based encrypted messaging (e.g., WhatsApp, Snapchat) to evade detection. [Doc. 240-7, p. 2].

On October 11, 2022, the Grand Jury returned a multi-defendant, multi-count Indictment charging Defendant with one count of Conspiracy to Distribute and Possess with Intent to Distribute Heroin and Fentanyl, in violation of 21 U.S.C. §§ 841(a)(1), 846, and 18 U.S.C. § 2. [Doc. 1]. Defendant was arrested on January 20, 2023, pled not guilty at his arraignment on February 7, 2023, and was detained pending trial. [Doc. 111];

[Doc. 112].

## DISCUSSION

On January 2, 2024, Defendant filed this Motion to Suppress under Federal Rule of Criminal Procedure 12(b)(3)(c) and the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. [Doc. 238]. Defendant argues that the four search warrants were invalid and that he did not freely and voluntarily give his post-arrest statement. [*Id.* at ¶¶ 20–25, 30–38]. The Government contends that each warrant was valid and that Defendant waived his *Miranda* rights before speaking to police. *See* [Doc. 240].

The Court held a hearing on December 10, 2024, *see* [Doc. 377], during which GCPD Investigators Walton and Dangle testified,[4] discussing the investigation and the information from confidential sources and Arnold, explaining how each warrant was obtained, and affirming that no material oral testimony had been presented to the issuing magistrate judges beyond what was written in the affidavits. [Doc. 377, pp. 15:4,

---

[4] The Court finds Officers Walton and Dangle to be credible. *See United States v. Gause*, No. 22-11685, 2023 WL 2194295, at *2 (11th Cir. Feb. 24, 2023) ("We give substantial deference to the district court's determination" regarding witness credibility for purposes of motions to suppress); *United States v. Stancil*, 4 F.4th 1193, 1199 (11th Cir. 2021) (discussing the broad deference given to district court's credibility determinations); *see also United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002) ("[A] trial judge's . . . choice of whom to believe is conclusive . . . unless the judge credits exceedingly improbable testimony." (citing *United States v. Cardona-Rivera*, 904 F.2d 1149, 1152 (7th Cir. 1990))). However, the Court only considers their testimony to determine whether Defendant waived his Miranda rights. *See infra* Section C.1.

66:9].[5] The Government admitted multiple exhibits into evidence: the search warrants, the affidavits supporting them, and a recording of Defendant's custodial interview. *See* [Doc. 370].

On January 27, 2025, the Government filed a Post Suppression Hearing Brief [Doc. 376], reiterating its position that the affidavits established more than a "fair probability" contraband would be found at each location or in the Charger, citing the multi-sourced evidence. Defendant did not file a separate post-hearing brief on the docket.

### A.    Legal Standard

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. The movant bears the initial burden of persuading the court, through specific factual allegations and supporting evidence, that the evidence

---

[5] At the hearing, defense counsel argued that the form checkboxes on the Sweetwater Apartment, Shadow Path House, and Dodge Charger search warrants suggested that the issuing judge received and recorded oral testimony to support the warrants' issuance, but that the Government had provided no such recording. *See* [Doc. 377, pp. 4:12–6:15]; [Doc. 240-1, p. 7]; [Doc. 240-3, p. 11]; [Doc. 240-5, p. 5]. Investigators Walton and Dangle testified that they did not give oral testimony. *See* [Doc. 377, pp. 15:4, 66:9]. Defendant raised this issue for the first time at the hearing without providing supporting legal authority or filing a post-hearing brief on the matter. Moreover, the affidavits alone provided a "substantial basis" for finding that probable cause existed. *See James*, 601 F. App'x at 791–92. Thus, the Court defers to the issuing judge's findings and presumes that oral testimony, if given, was consistent with the affidavits. *See id*.

should be suppressed. *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977).[6]

**B.    Sweetwater Apartment and Shadow Path House Warrants**

First, Defendant moves to suppress all evidence seized by law enforcement officers from the Sweetwater Apartment and Shadow Path House. *See* [Doc. 238, Sections A–B].

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Thus, a search warrant must comply with four fundamental requirements: (1) the warrant must be based on probable cause, (2) that probable cause must be supported by sworn testimony or an affidavit, (3) the place to be searched must be described with particularity, and (4) the evidence to be seized must be particularly described. *Groh v. Ramirez*, 540 U.S. 551, 557 (2004).

"Probable cause exists when under the totality-of-the-circumstances there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Tobin*, 923 F.2d 1506, 1510 (11th Cir. 1991) (quoting *Gates*, 462 U.S. at 238). This standard is a commonsense, practical one that turns on the factual and

---

[6] "[T]he decisions of the United States Court of Appeals for the Fifth Circuit (the 'former Fifth' or the 'old Fifth'), as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, shall be binding as precedent in the Eleventh Circuit, for [the court of appeals], the district courts, and the bankruptcy courts . . . ." *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

practical considerations of everyday life on which reasonable officers act. *Ornelas v. United States*, 517 U.S. 690, 695 (1996).

"For an officer's affidavit to support probable cause, it cannot be 'a mere conclusory statement that gives the [issuing judge] virtually no basis at all for making judgment regarding probable cause.'" *United States v. James*, 601 F. App'x 789, 791–92 (11th Cir. 2015) (quoting *Gates*, 462 U.S. at 239). However, a magistrate judge's decision to issue a warrant is entitled to substantial deference, and reviewing courts should ensure only that the magistrate judge had a "substantial basis" for determining that probable cause existed. *Id.*

The Fourth Amendment's particularity requirement prevents "general warrants" that authorize wide-ranging rummaging. *See Maryland v. Garrison*, 480 U.S. 79, 84 (1987). Nevertheless, law enforcement need only describe the specific categories of evidence being sought in a way that reasonably limits the search. *See United States v. Wuagneux*, 683 F.2d 1343, 1349 (11th Cir. 1982). A warrant does not become impermissibly broad merely because it authorizes the seizure of multiple types of evidence commonly associated with the offense under investigation—particularly where that offense is narcotics trafficking, which regularly involves physical contraband, currency, records, electronic devices, and other items needed to run a distribution operation. *See United States v. Smith*, 918 F.2d 1501, 1507 (11th Cir. 1990).

"[T]he burden is on a defendant who seeks to suppress evidence obtained under

10

a regularly issued warrant to show the want of probable cause." *de la Fuente*, 548 F.2d at

534 (quoting *Batten v. United States*, 188 F.2d 75, 77 (5th Cir. 1951)); *see United States v.*

*Wentworth*, 446 F. Supp. 3d 1302, 1307 (M.D. Ga. 2020). "In passing on the validity of [a]

warrant, consideration may be given only to the information brought to the attention of

the [issuing judge]." *United States v. Lockett*, 674 F.2d 843, 845 (11th Cir. 1982). Thus, the

Court looks within the four corners of the affidavits to determine whether the requisite

probable cause existed.

### 1.    Sweetwater Apartment

Defendant argues that the Sweetwater Apartment warrant "was not supported

by probable cause," that "[t]he affidavit doesn't mention any controlled buys occurring

within the residence," and that "[t]he good faith exception does not apply because the

magistrate lacked a substantial basis to believe that Defendant was conducting drug

activity out of the location." [Doc. 238, ¶ 20]. The Court finds that the Sweetwater

Apartment warrant affidavit establishes probable cause through multiple mutually

reinforcing facts:

> (1) A confidential source, CS-1, told investigators that after police searched
>
> Defendant's previous trap house in Peachtree Corners, Defendant
>
> relocated his drug stash to the Reflections on Sweetwater Complex—
>
> specifically either Building 3 or 4. [Doc. 240-1, p. 3].
>
> (2) CS-1 had personally visited the Sweetwater Apartment "numerous times

to acquire more narcotics" from Defendant. [*Id.*].

(3) CS-1 gave step-by-step directions to reach this new apartment, reporting that Defendant was operating a "trap house" setup. [*Id.* at p. 3].

(4) GCPD surveillance observed Defendant traveling to and from the Sweetwater Apartment carrying backpacks in a manner consistent with drug trafficking. [*Id.*].

(5) A second source, Michael Arnold, corroborated the information provided by CS-1. Arnold was arrested on February 2, 2022, carrying approximately 247 grams of narcotics immediately after exiting Building 3. [*Id.* at pp. 5–6]. In a post-arrest interview, Arnold identified his supplier as "LC," gave a detailed physical description matching Defendant, and gave investigators directions on how to get to the Sweetwater Apartment. [*Id.* at p. 6].

This information easily establishes a "fair probability" that contraband would be found at the Sweetwater Apartment, *see Gates*, 462 U.S. at 238, and the issuing magistrate did not need to see evidence of hand-to-hand drug sales physically observed by officers in the unit, *see United States v. Jenkins*, 901 F.2d 1075, 1080 (11th Cir. 1990).

Defendant also asserts that the warrant was unconstitutionally overbroad. [Doc. 238, ¶ 21]. The warrant authorizes seizure of "U.S. currency," "packaging materials," "digital scales," "cellular telephones," and other items commonly associated with drug

trafficking. [Doc. 240-1, p. 1]. Thus, it reasonably limits the search to specific categories of evidence associated with the suspected crime, *see Wuagneux*, 683 F.2d at 1349, and is far from a constitutionally impermissible "general warrant."

## 2.    Shadow Path House

Defendant similarly challenges the search warrant for the Shadow Path House, claiming that it was unsupported by probable cause, was overbroad, failed to show a substantial link between the alleged criminal activity and the Shadow Path House, and was stale. *See* [Doc. 238, Section B]. The Shadow Path House warrant affidavit sets out the following facts:

(1)  CS-1 gave investigators directions to the Shadow Path House, identified it as Defendant's residence, and stated that he had personally been there to purchase narcotics. [Doc. 240-3, pp. 5–6].

(2)  In February 2022, CS-1 informed investigators that CS-1 received methamphetamine and cocaine directly from Defendant at the Shadow Path House for the purpose of redistribution. [*Id.* at p. 6]. CS-1 then turned those narcotics over to investigators, who performed field tests confirming they were meth and cocaine. [*Id.* at p. 8].

(3)  CS-1 reported that in February 2022 CS-1 delivered approximately $65,000.00 of narcotics proceeds to Defendant at the Shadow Path House. [*Id.* at p. 9].

(4) Investigators discovered corporate filings showing the Shadow Path House as the principal office address for Cora Creations LLC, which lists Defendant and his wife as organizers, further confirming Defendant's connection to the residence. [*Id.* at p. 8].

(5) Investigator Dangle assessed that Defendant split his operations between the Sweetwater Apartment—a stash house—and the Shadow Path House—his primary residence—citing the frequent practice of traffickers using multiple locations to store product and proceeds. [*Id.* at p. 9]. Investigator Dangle stated that he sought to seize "drugs, cash, cell phones, and ledgers," because these items are frequently found "where the dealer lives." [*Id.*].

These facts establish a clear nexus between Defendant's alleged narcotics distribution and his residence, and together they create a "fair probability" that contraband would be found at the Shadow Path House. *Gates*, 462 U.S. at 238–39.

As with the Sweetwater Apartment, because the warrant sought items traditionally associated with drug trafficking, and the affidavit clearly tied those items to Defendant's suspected narcotics distribution, the Court concludes that the warrant for the Shadow Path House complied with the Fourth Amendment's particularity requirement. *See Garrison*, 480 U.S. 79, 84 (1987). As for Defendant's staleness argument, the affidavit set forth continuous investigative efforts, culminating in Arnold's arrest on

14

February 2, 2022, and subsequent surveillance of Defendant's movements, demonstrating that the information was current. *See* [Doc. 240-3]; *see United States v. Beraldi*, 226 F.3d 1256, 1265 (11th Cir. 2000).

### C.    Post-Arrest Statement, Dodge Charger, and Cell Phones

Defendant also seeks to suppress his post-arrest statement, and any evidence obtained from his vehicle and cell phones as "fruit of the poisonous tree." [Doc. 238, Sections C–E].

### 1.    Post-Arrest Statement

Defendant asserts that his post-arrest statement was not freely and voluntarily given. [*Id.* at Section C]. The Fifth Amendment requires law enforcement officers to apprise an individual of his *Miranda* rights—namely, the right to remain silent, that any statements can be used against them, the right to have counsel present, and the right to appointed counsel if needed—before engaging in a custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444–45 (1966).[7] "If a defendant unambiguously requests for counsel or to remain silent, police must cease interrogation." *Hall v. Thomas*, 611 F.3d 1259, 1285 (11th Cir. 2010) (citing *Berghuis v. Thompkins*, 560 U.S. 370 (2010)). On the other hand, an individual may choose to waive their *Miranda* rights and speak with police. *See id.*

---

[7] The parties do not dispute that Defendant was subjected to a custodial interrogation.

When the Government seeks to use a statement given by an individual in custody without an attorney present, the Government bears the burden of proving by a preponderance of the evidence that the individually waived his *Miranda* rights voluntarily, knowingly, and intelligently. *Hall*, 611 F.3d at 1285 (quoting *Thompkins*, 560 U.S. at 384). An implicit waiver *can* be sufficient, and an express waiver is neither necessary nor necessarily sufficient. *Id.* Either way, the Court must ultimately determine whether the waiver was knowing, voluntary, and intelligent. *See id.*

To be voluntary, a waiver must result from a free and deliberate choice, free from intimidation, coercion, or deception; and to be knowing and intelligent, the suspect must fully understand both the nature of the right being abandoned and the consequences of that decision. *Thompkins*, 560 U.S. at 383–84 (citations omitted). "[I]f the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension, . . . a court [may] properly conclude that the *Miranda* rights have been waived." *United States v. Rush*, 144 F. App'x 13, 15 (11th Cir. 2005) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

The evidence, based on the video recording of the interview and Investigator Walton's testimony,[8] clearly supports a finding that Defendant waived his *Miranda* rights. After his arrest on February 10, 2022, law enforcement officers transported

---

[8] The Court finds Officer Walton to be credible. *See supra* note 3.

Defendant to the GCPD Headquarters and placed him in an interview room. [Doc. 377, p. 20:8–11]. Defendant waited alone for one hour and thirty-six minutes, was offered food and drinks, and was allowed to go to the restroom if needed. [*Id.* at p. 20:16–18, 51:21–23].

The video recording of Defendant's interview, admitted into evidence as Government's Exhibit #9, shows that Investigators Walton and Davis entered the room, introduced themselves, and asked Defendant for his name, date of birth, and phone number. [Doc. 370, Gov't Exhibit #9, Interview Video at 1:37]. Investigator Walton then explained that he was conducting a narcotics investigation, read Defendant his *Miranda* rights from a printed card, *see* [Doc. 370-9], and asked if Defendant understood his rights. [Doc. 370, Gov't Exhibit #9, Interview Video at 1:38]. Defendant acknowledged that he understood his rights verbally—"I understand"—and by nodding, then proceeded to speak without requesting an attorney or terminating the interview. [*Id.*].

The tone of the conversation was conversational and non-threatening. *See* [*id.*]. To be sure, Investigators Walton and Davis were wearing masks during the interview, which Investigator Walton explained was to protect their identity because they were working in an undercover capacity at the time. [Doc. 377, p. 25:7–8]. But there is no evidence that the officers used threats, coercive tactics, or denied Defendant basic needs.

Considering the totality of the circumstances, the Court concludes that

17

Defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights. *See Hall*, 611 F.3d at 1285. Thus, law enforcement officers were free to use Defendant's statements in seeking search warrants for his vehicle and cell phones.

### 2. Dodge Charger

Defendant argues that "[b]ut for [his post-arrest statement], investigators would have completely lacked probable cause to search his vehicle." [Doc. 238, Section D]. This argument implicitly concedes that his post-arrest statement supplied the necessary probable cause. Even absent Defendant's admission to having marijuana in the vehicle, the Dodge Charger warrant affidavit clearly establishes probable cause:

(1) Before GCPD investigators executed the search warrants on the Sweetwater Apartment and Shadow Path House (where they seized a variety of illegal narcotics, digital scales containing cocaine residue, baggies used to package narcotics, and a metal press commonly used to press narcotics), law enforcement officers observed Defendant depart the Sweetwater Apartment in the Dodge Charger, drive in a manner that they perceived as an attempt to detect police surveillance, and park at a RaceTrac gas station; and

(2) "A Gwinnett County Police Department K9 (Kai) later positively alerted on the [vehicle]."

[Doc. 240-5, p. 4]. Under the totality of the circumstances, these facts easily established a

18

"fair probability" that the vehicle contained narcotics or related evidence. *Gates*, 462 U.S. at 238. The magistrate reasonably issued a search warrant on that basis. Thus, evidence seized from the Charger is admissible.

### 3.    Cell Phones

Defendant next contends that the February 14, 2022, warrant to search two Apple iPhones failed to establish probable cause for each category of data to be searched and was overbroad. [Doc. 238, Section E]. He cites heightened privacy considerations for modern smartphones, arguing the Government must narrowly tailor such searches. [*Id.*]. The cell phone warrant affidavit includes the following information:

(1) Defendant used multiple phone numbers and messaging applications to coordinate drug transactions, as confirmed by CS-1, CS-2,[9] and Michael Arnold. [Doc. 240-7, pp. 2–4]. Investigator Walton explained that "application-based forms of communication are exceedingly common among drug traffickers, as they commonly offer end-to-end encryption for their customers." [*Id.* at p. 9].

(2) Drug traffickers often maintain records, such as call logs, text messages, and digital files, on their smartphones, which are vital to their operations,

---

[9] CS-2 would contact Defendant using the same phone number Leonard called from the Gwinnett County Jail to discuss the GCPD's search of the apartment in Peachtree Corners. [Doc. 240-7, p. 3]. Investigator Walton's affidavit explained in great detail why he found CS-2 to be reliable and trustworthy. *See* [*Id.* at pp. 3–4].

[*Id.* at pp. 8–9].

(3) One phone was recovered from a phone mount attached to the vehicle's windshield, and the other was recovered from the cupholder within the driver's immediate reach. [*Id.* at p. 9].

(4) The phones were recovered from the Dodge Charger—a vehicle already linked to Defendant's drug trafficking activity as explained above. [*Id.* at p. 2].

While it is true that cell phone searches raise acute privacy concerns, Defendant's argument that the warrant is invalid for lack of a time limitation is unavailing. *See* [Doc. 238, p. 16]. The warrant here specifically enumerates the types of data to be searched for, directed at finding evidence of Defendant's suspected drug activities, thereby confining the search to drug-related evidence and satisfying the Fourth Amendment's particularity requirement. *See Riley v. California*, 573 U.S. 373 (2014).

Because the warrants indicated that these phones were recovered from a vehicle that contained illegal narcotics and was last driven from a trap house, and in light of all the other facts in this case, there was a fair probability that these phones contained evidence of the ongoing conspiracy. *See Gates*, 462 U.S. at 238.

## CONCLUSION

Accordingly, because each warrant complied with the Fourth Amendment, and because Defendant waived his *Miranda* rights, the evidence obtained through these

searches and Defendant's custodial interview is admissible. Therefore, the Court

**DENIES** Defendant's Motion to Suppress [Doc. 238].

      **SO ORDERED**, this 24th day of March, 2025.

                         S/ Tilman E. Self, III

                         **TILMAN E. SELF, III, JUDGE**
                         **UNITED STATES DISTRICT COURT**